MACK VS. THE STATE.

*November 12, 1879 — February 3, 1880.*

CRIMINAL LAW AND PRACTICE: EVIDENCE: COURT AND JURY. *(1) Refusal of defendant's testimony as to conversations, after admitting that against her. (2) When words spoken admissible as parts of the* res gestæ. *(3) Defendant's right to show facts to repel unfavorable inferences arising from other facts shown by the state. (4) Admission, in prosecution for murder, of defendant's testimony before coroner's jury. (5) Credibility of witness; court and jury.*

| | |
|---|---|
| 48 | 271 |
| 78 | 190 |
| 48 | 271 |
| 88 | 408 |
| 48 | 271 |
| 100 | 307 |

1. Where, on trial of an information for murder, acts and conversations between the accused and the deceased, which occurred a short time before the death, were admitted in evidence on behalf of the state, and were both material as tending to show the state of mind of the accused toward the deceased, it was error to reject evidence for the defense as to the same conversations; and, the accused being, by the law of this state, a competent witness in her own behalf, it was error to reject *her* testimony as to such conversations; and the fact that there was *other* testimony by and for the accused to the point that after such acts and conversations the parties had been reconciled and their relations were apparently pleasant, does not relieve the error.

2. When the acts of a party are admissible in evidence, what was *said* at the time of doing the acts, being a part of the transaction, explaining and characterizing it, and deriving credit from it, is also admissible as part of the *res gestæ;* and under the circumstances of this case (for which see the opinion), after the state had properly put in evidence the *acts* of the parties a short time before the death, the defense would have been entitled to show the conversation between them occurring at the same time, even if the state had not introduced evidence of such conversation.

3. The state introduced evidence to show (as a motive for the murder) that the accused, being the wife of the deceased, had a criminal intimacy with one X, who was in the employ of the deceased; and such evidence tended to show that X had been discharged by the deceased, and, after being reemployed, had again been discharged by him after one day's service. *Held,* that it was error to reject evidence for the defense to show why X left such employment, offered to repel the inferences unfavorable to the accused sought to be derived from the state's evidence.

4. There was no error in permitting the state to put in evidence the testimony of the accused, given at the coroner's inquest, before the arrest.

5. The *credibility* of a witness is a question for the jury, under proper instructions and cautions from the court, notwithstanding he may have made contradictory statements under oath, or be an accomplice of the accused.

ERROR to the Circuit Court for *Rock* County.

For the plaintiff in error, there was a brief by *Winans & McElroy*, her attorneys, with *Ogden H. Fethers*, of counsel, and oral argument by *Mr. Winans* and *Mr. Fethers*.

For the state, there was a brief by *Alex. Wilson*, the Attorney General, and oral argument by *H. W. Chynoweth*, Assistant Attorney General.

TAYLOR, J.   The plaintiff in error was tried in the circuit court for Rock county upon an information for the murder of her husband, convicted of murder in the first degree, and judgment entered against her that she be imprisoned for life in the state prison.   A bill of exceptions was regularly settled and filed in said court, and a writ of error issued, bringing the record to this court for a review of the exceptions taken on the trial by the plaintiff in error.   The exceptions taken, and upon which she relies in this court for a reversal of the judgment against her, are mainly exceptions to the introduction of evidence against her, and to the rejection of evidence, offered by her.

The record shows, with such a degree of certainty that it is hardly controverted by the plaintiff in error, that on the night of the 13th day of July, 1878, at his residence in the town of Turtle, in Rock county, the husband of the plaintiff in error was murdered; and that early in the morning of the 14th of July his dead body was found by his hired boy in the horse stable in his barn, lying behind one of the horses.   There was a large wound upon the side of his head, cutting through the scalp, but not apparently fracturing the skull; and subsequent examination showed that he had received fatal injuries about the chest, and several of the ribs were fractured.

The evidence also shows that she was living with him in the same house at the time of his death, but that she had not slept in the same room or bed with him for a considerable time before his death. The only other persons at the deceased's house on the night of his death were a boy, Joseph Watsic, who was about nineteen years old; a man, Frank Dickerson, about twenty-three years old, who was charged with assisting in the murder; and Ettie Mack, aged fourteen years, Bernice, aged six years, and Beatrice, aged three years, children of the deceased and the accused.

On the night of the murder, Joseph Watsic slept up stairs, in the same room, but not in the same bed, with the man Dickerson. All the children slept up stairs. The deceased slept below, and the accused was accustomed to sleep below, but swears that on this night she slept up stairs with her oldest daughter. The youngest child had slept with the deceased, but on this night she had been put to bed up stairs, as the accused said, because it was warm and she thought the child might disturb her husband.

It appears that Watsic and the children heard no noise or disturbance of any kind about the house during the night; that the accused called Watsic to get up about sunrise on Sunday morning, which was earlier than he was accustomed to rise; that when he got up Dickerson requested him to go to the barn and feed the horses, though Dickerson usually fed and took care of them; and that Watsic got up and went to the barn, and found the dead body of the deceased in the stable behind one of the horses.

The evidence further showed that the deceased was jealous of Dickerson, and suspected him of having improper intercourse with his wife; that on the night previous to the murder he and the accused had had a quarrel about midnight, during which she had struck him with considerable violence on the head with a heavy pitcher; that after she struck him over the head he went out of the house to the barn, and she

followed him out; and that Frank Dickerson saw them when they came out of the house on that night, and claims to have heard what was said between the deceased and his wife on that occasion.

The accused denies all knowledge of how the deceased came to his death, and says she did not awake after she went to bed that night until the morning, and heard no disturbance or noise of any kind about the house.

The evidence also shows that not long before this the deceased had purchased a pistol and brought it to the house, and that the accused had got it in her possession and hid it from him; and that is alleged to have been the cause of the quarrel on Friday night.

Dickerson swore, on the trial, that there had been illicit intercourse between himself and the accused frequently while he was in the employ of the deceased; that the deceased had discharged him, and that he was reëmployed at the solicitation of the accused; that on the night of the murder the accused came to the door of the room where he slept, but said nothing at first; that about an hour after, she came up stairs to the door again, and then he heard the deceased open his door down stairs and come up; that she had the revolver in her hand; that she turned and followed deceased down stairs, and said, "Frank, come down stairs;" that he then got up and went down stairs, and as he stepped from the dining room to the kitchen door they were talking pretty loudly, and the accused took a club from the wood-box and struck the deceased on the side of his head, and he fell and did not move; that at the instigation of the accused he helped her carry the body to the barn, and placed it behind the horse, where it was found in the morning; that the accused took the horse by the head and backed her up in order to make her step on the body. He details with great particularity what conversations took place between them; that she made him take off his shirt, which had some blood on it, and that they took some cloths which

Mack vs. The State.

had been wrapped around the head of deceased when they carried him to the barn, and were bloody, and hid them under the privy; and that it was arranged that she should call Watsic in the morning, and that he should tell Watsic to go out and feed the horses, so that he might discover the dead body. When first asked by one of the neighbors, who had assembled there on Sunday morning, how he was killed, she said that "the horse killed him; she found him behind the horse."

The record also shows that Dickerson had at first, when before the coroner, denied all knowledge of how the death occurred, and denied all criminal intercourse with the accused; and that he boldly admitted on the trial that he had sworn falsely on these occasions.

I have made this brief statement of some of the principal things connected with the murder, as sworn to by the witnesses, not for the purpose of conveying the idea that it is a summary of the evidence given on the trial — the trial occupied several weeks, and the whole testimony, as taken by the reporter, covers over 2,000 written pages, — but for the purpose of showing the materiality of some of the evidence which was offered by the accused and ruled out by the court.

It will be seen, from the foregoing statement, that the only witness who gives any direct evidence of the killing of the deceased by the accused, is the witness Dickerson; and it is evident, from the statement, that his connection with the murder is such as to render his evidence subject to very great suspicion, and that his former contradictory statements as to the most material facts, under oath, so impeached his credibility that the jury would have been justified in disbelieving his testimony, unless corroborated by the other evidence in the case. The conviction, if sustained, must be sustained mainly upon the circumstantial evidence produced against her; and it is this view of the case which has compelled us to the conclusion that the court erred in excluding evidence which might have explained some of the strongest

points which the circumstantial evidence makes against the accused.

· In the absence of satisfactory. direct evidence of the com· mission of the crime by the accused, it was necessary for the state to strengthen the circumstantial proofs of facts existing at the time of the murder, tending in some degree to fasten the guilt upon her, by showing, if possible, some adequate impelling motive which might induce her to commit the murder. This the state undertook to do, first, by showing that the affectionate and kindly feelings which ordinarily exist between husband and wife, had long since ceased to exist between the deceased and the accused; that in place thereof the accused had come to look upon her husband with feelings of hatred and contempt, and the husband was filled with jealousy, and possibly harbored thoughts of revenge, and the peace and harmony which should surround the home had given place to disgraceful quarrels, resulting in personal violence. Having shown that the affectionate relations of husband and wife no longer existed, the state then undertook to show that the accused, impelled by her passions, had violated her marital vows, and carried on an adulterous intercourse with the man Dickerson in the house of her husband. By this evidence the state laid the foundation for the argument that the hatred of her husband and her unhallowed desire for her paramour would be an irresistible motive impelling her to remove, by the terrible crime of murder, the object of her hatred, and thus open the way to the full gratification of her lustful passion for Dickerson.

Every part of the evidence, therefore, which tended to show her hostility towards her husband or her passion for Dickerson, became most material in the case.

The evidence of the transaction about midnight on the Friday night before the murder, in which, it is admitted, the accused struck the deceased a violent blow upon the head with a heavy pitcher, was peculiarly pertinent in showing the feel-

ing of enmity existing on her part at the time. And it is in connection with the evidence given and the evidence offered in regard to this transaction, that we think the learned circuit judge committed an error which may have prejudiced the accused, and which this court cannot overlook. The record shows that the witness Dickerson had testified, on the part of the state, that he saw a part of this transaction, and was permitted to testify to the conversation which he heard between the deceased and the accused at the time.

Afterwards, when the accused was called as a witness in her own defense, her counsel offered to show her version of the conversation at that time; and, upon the objection of the district attorney, the court excluded it, and the defendant duly excepted. We are unable to understand upon what rule of law this offer was excluded. The state considered the conversation material, and there can be no doubt of its materiality. If the conversation showed that the accused accompanied her acts of personal violence with language which indicated a wicked intent and a state of mind which would be likely to impel her to other acts of violence, or if the acts of violence were accompanied with threats of future violence, there can be no doubt of its competency on the part of the state as against her. The evidence being clearly competent, and having been introduced by the state, it would seem to be equally clear that the accused should have been permitted to prove the same conversation by any other witness who was present and heard the same. She would not be concluded by the version of it given by the witness Dickerson. She looked upon him as prejudiced, and claimed that he had not given a true version thereof. The law having made her a witness in her own behalf, she was as competent to testify upon the subject as any other person who might have been present and heard the same. It is unnecessary to cite authorities to show that when one party has given a conversation in evidence, or a part thereof, which is material in the case, the other has the right

to give his version of the same conversation by other witnesses who were present and heard it.

The offer on the part of the defendant in relation to this matter was as follows: Counsel for the accused said, "I desire to show what was said between the parties when he went out of the house on that Friday evening, and she followed him; after they returned, what was said; and all that was said as to that matter during that night."

To this offer the learned circuit judge made the following remark: "It being twenty-four hours before the death of Mack, and as after this the matter was arranged, compromised between them, so that they were good friends, I don't think it is proper at all to open the subject by showing what was said between the parties this Friday night."

Counsel for the defendant then answered: "If the fact is that they both agreed to bury their domestic difficulties on that Friday night, and hide them from the public gaze, and make up from that time until the time of his death, and everything was pleasant between the parties, it seems to me that in that view it is competent."

The court replied: "You have the direct testimony of the witness already that those matters were fully adjusted between them, and you have the testimony of the daughter to the effect that, on Saturday following the Friday night, their relations were extremely pleasant. The bearing and conduct of each to the other was so. It stands, as I understand, as domestic discord, to be treated on either side as the circumstances under which it occurred seems to suggest that it would be proper on each side."

In the testimony given by Dickerson in regard to the transaction, he swears as follows: "It was about 12 o'clock at night; . . . as I was going out again to the barn to call Joe Watsic, I heard Mack come through into the kitchen, and heard *Mrs. Mack* say, 'Do you see that?' and Mack replied, 'Yes; keep it if you want to.' When Mack came

around the corner of the house, *Mrs. Mack* came around the corner, and was looking towards the kitchen door that Mack came out of; and I thought I heard her cocking a revolver, and he (Mack) said, 'Shoot. me, will you, you d——m b——h,' and started and ran towards the barn; and *Mrs. Mack* said, 'Run, you coward,' or something like that. *Mrs. Mack* came out to the barn and said, 'George, come here.' He said, 'What do you want?' She asked him 'what he was afraid of—I am not going to touch you.' Mack said, 'The boys are come;' and she said, 'Let us make up.' He says, 'The boys are coming—we had better go into the house;' and I saw *Mrs. Mack* go towards the house, and did not see where Mack went to."

This is all the evidence which was given as to·what was said by the parties at the time. The court, however, permitted full evidence to be given as to what was done by the respective parties, but excluded all further evidence as to what was said by them during the transaction and relating to the same. This evidence did not show any reconciliation of the parties; and, although the court permitted the accused to state what was done, and to make a general statement that they had made up and become reconciled after this violent and disgraceful scene, we think the accused had the right to lay before the jury what was said by the parties, from which she drew the conclusion that a reconciliation had taken place. If she had been permitted to detail all that was said, the jury might have come to the conclusion that her general statement that they had made up, and that the angry passions arising out of this disgraceful personal conflict had passed away and given place to kinder feelings, was a truthful one; but without such detail they may have disbelieved her general conclusion altogether.

The state having opened the door to admit what was said by the parties on this occasion, for the purpose of prejudicing the cause of the accused, the court could not justly close

Mack vs. The State.

it against a full and complete statement of all the details of the conversation attending it. If she admitted herself in fault, and sought forgiveness and reconciliation, she was entitled to lay before the jury what she said as well as what she did, so that they might judge from her words, as well as from her acts, whether she regretted and repented of what had been done. It was not for the court to say that, as the evidence of what was done was before the jury, and a general statement as to the conclusion which resulted from their conversation, it was of no importance to the accused to show all the details of what was said, either for the purpose of giving character to what was done, or of convincing the jury that her statement of the conclusion which was reached was a truthful statement.

We think that the learned circuit judge erred in holding as a rule, in the trial of this case, that although acts done might be given in evidence when such acts tended to prove any material issue in the case, yet what was said at the time by the person doing the acts must be excluded. After a careful examination of the authorities we think they are almost uniform in holding, that when the act of a person may be given in evidence and is pertinent proof, what was said at the time of the doing of the act may also be given in evidence as a part of the *res gestæ;* it becomes a part of the act itself, is explanatory of it, and gives it, to a great extent, its character.

The fact that the acts given in evidence occurred previous to the time when the murder was committed, can make no difference as to the rule. If the acts of the accused done before the commission of the crime with which she is charged are competent evidence tending to show that she committed such crime, then what was said at the time the act was done is also admissible, as explanatory of the same, and as indicative of the intent or object of the act. The reason for this rule is very forcibly stated by the court in *Wiggin v. Plumer*, 11 Foster (N. H.), 251–267: "'Where evidence of an act done by a party is admissible, his declarations made at the time having

Mack vs. The State.

a tendency to elucidate or give character to the act, and which may derive a degree of credit from the act itself, are also admissible as part of the *res gestæ.*' And the rule is substantially stated in the same way in *Gordon v. Shurtleff*, 8 N. H., 260; *Plumer v. French*, 2 Foster, 454; and *Hersom v. Henderson*, 3 Foster, 498.

"When a fact is offered in evidence, the whole transaction, if it consists of many particulars, may and ought to be proved. Every additional circumstance proved may vary the effect of the evidence — may neutralize it or give it point. What is then said by the parties, and what is said by others to them, relative to the subject of the transaction, is a part of the transaction itself. It is admissible on the same principle that every other part of it is, that the whole matter may be seen by the jury — upon the same principle which disallows extracts of written papers, that their effect may be materially varied by the part omitted. Contemporaneous but otherwise unconnected conversation is rejected on the same ground as other unconnected facts. If the statement offered in evidence does not tend to elucidate or give character to the acts proved, it is to be rejected. If it is upon the same subject and relative to the act in proof, it should be received."

The case of *Wiggin v. Plumer*, *supra*, was referred to by the late learned Justice PAINE in the case of *Ranger v. Goodrich*, 17 Wis., 78–85, and approved as stating the true rule in cases of this kind. The same rule is stated by the court in *Lund v. Tyngsborough*, 9 Cush., 36–41, as follows:

"If a declaration has its force by itself as an abstract statement, detached from any particular fact in question, depending for its effect on the credit of the person making it, it is not admissible in evidence. Such a declaration would be mere hearsay. As when the holder of a check went into a bank, and when he came out said he had demanded its payment; this declaration was held inadmissible to prove a demand, as being no part of the *res gestæ*. This statement was a mere

narrative, wholly detached from the act of demanding payment, which was the fact to be proved.  But where the act of a party may be given in evidence, his declaration made at the time, and calculated to elucidate and explain the character and quality of the act, and so connected with it as to constitute one transaction, and so as to derive credit from the act itself, are admissible in evidence.   The credit which the act, or fact, gives to the accompanying declarations as a part of the transaction, and the tendency of the contemporary declarations, as a part of the transaction, to explain the particular fact, distinguish this class of declarations from mere hearsay.

"Such a declaration derives credit and importance as forming a part of the transaction itself, and is included in the surrounding circumstances, which may always be given in evidence to the jury with the principal fact. . . . Perhaps the most common and largest class of cases in which declarations are admissible, is that in which the state of mind, or motive, with which any particular act is done, is the subject of inquiry.   Thus, where the question is as to the motives of a debtor in leaving his house and going and remaining abroad, so as to determine whether or not an act of bankruptcy has been committed, his declarations when leaving his house and while remaining abroad are admissible in evidence.   Such declarations accompanying the act belong to the *res gestæ*. They are calculated to elucidate and explain the act, and they derive a degree of credit from the act."

This court, in the case of *Bates v. Ableman*, 13 Wis., 644–650, admits the justice of the rule as stated in the latter part of the above quotation, in the following language: "It is undoubtedly true that where the intent of a party to a sale is in issue, his statements at the time, and so connected with the transaction as to be a part of the *res gestæ*, are competent evidence to show such intent, even though the person is not a party to the suit."   In the case of *Sorenson v. Dundas*, 42 Wis., 642, the rule is stated very briefly:  "Declarations are

verbal parts of the *res gestæ* only when they are contemporaneous. The respondent's narrative after the occurrence belonged no more to the *res gestæ* than his evidence on the trial." *Felt v. Amidon*, 43 Wis., 467.

In *Hamilton v. State*, 36 Ind., 280, it is said: "It is well established by the authorities, that in all cases, civil or criminal, where evidence of an act done by a party is admissible, his declarations made at the time, having a tendency to elucidate, explain or give character to the act, are admissible. They are a part of the transaction, and for that reason are admissible, and it makes no difference, so far as the admissibility of the declaration is concerned, whether it be in favor of or against the party making it. If the act was one of alleged criminality, and the accompanying declaration tends to show it to be innocent, it is equally admissible as when the tendency is to show the criminality of the act; and it may be given in evidence by the defendant as well as by the state." See also, upon this subject, *Parsons v. State*, 43 Ga., 197; *Comfort v. People*, 54 Ill., 404; *Head v. State*, 44 Miss., 731; *McKee v. People*, 36 N. Y., 113; *Russell v. Frisbie*, 19 Conn., 206.

Within the rule of these decisions as to what conversations may be given in evidence as a part of the *res gestæ*, the accused had, as we think, the right to give the jury the conversation which took place between herself and her husband on the Friday evening during the continuance of the transactions which were given in evidence against her, even though the state had not given any part of such conversation in evidence on its part. She had the right to have the whole transaction laid before them, including the conversation; and it was error to restrict her to a bare statement of what was done. The conversation, if detailed to the jury, might or might not have benefited her case. Of that she had the right to judge, and neither the judge of the court below nor the judges of this court can say that she would not have been benefited by a full disclosure of all that was said at the time.

This rule of permitting acts to be given in evidence and excluding all conversations and statements which accompanied the doing of such acts, was carried through the entire trial. The authorities clearly show that such rule was erroneous.

An instance of the prejudicial operation of this rule against the accused will be found in that part of the evidence offered by the state tending to show that she had formed a violent passion for Dickerson, and that she desired to retain him in the employ of her husband for the purpose of gratifying such passion. The state had shown that, on the Friday night before the murder and before the trouble at midnight, there had been some other trouble between the accused and the deceased, and Dickerson then told her he was going to leave, and she replied that "if he did, she would go to the old well," and that she started towards the well. The oldest daughter also testified that her mother did go towards the old well, and that she saw her mother crying as she went; that she followed her to the well, and her father came there soon after.

The counsel for the accused asked the court whether he could ask the daughter what her mother said to her when she came up to her on her way to the old well. The court refused to permit the question to be asked, and exception was duly taken. The inference the state sought to draw from this evidence was, that the accused was so completely under the control of her passion for adulterous intercourse with Dickerson, that she seriously meditated suicide in case he left her, or else that she made the threat with the purpose of inducing him to remain. It was only in this view of the case that the evidence was material, and in this view it was very damaging evidence against the accused; yet the court refused to let her, through her witnesses, give in evidence her declaration, made in the very act of going to the well, as to her purpose in going there. The evidence, we think, was clearly competent. If the act of going to the well was competent, her statement at the time as to why she was going, made while going, should

have been admitted. The jury are to say whether they would believe the statement, made at the time to the daughter, or whether they would give credit to the statement made by the discredited witness, Dickerson.

If the witness had been allowed to give the statement of the accused, made at the time, it might have satisfied the jury that the weeping of the accused was not occasioned by her grief at the anticipated desertion of her alleged paramour, and that her going to the well was for an entirely innocent purpose; and might have repelled the inference that she was willing to commit suicide rather than be parted from him.

The rule of excluding what was said at the time acts were done, and yet permitting the acts themselves to be proved, being clearly erroneous, it necessarily led to the exclusion of evidence which might have had weight with the jury, and have impressed them in her favor; and for this reason we feel compelled to reverse the judgment and direct a new trial.

There was another exception taken by the accused, which we think was well taken. Evidence was given that Dickerson had been discharged by the deceased; and that he was reëmployed, but left again after one day's service. This evidence was given by the state as a circumstance tending to show that the deceased discharged him the second time for the reason that he had discovered improper intercourse between him and his wife. The accused offered to show why Dickerson left at this time, and the evidence was rejected. We are clearly of the opinion that, within the rule before stated, the evidence was competent. It seems to us very clear, that if the fact that he left the employment of the deceased was material evidence for the state, the accused had the right to show the reason of his leaving. If the evidence had been admitted, it might have appeared that his leaving had no relation to his supposed improper intimacy with the accused.

The objection to the introduction in evidence of what the accused said as a witness under oath before the coroner, is

fully answered in the opinion filed in the case of *Dickerson v. The State*, and the answer need not be repeated here.

We are not prepared to say that the court committed any error in refusing to give the instructions asked by the learned counsel for the accused as to the credit which the jury should give to the evidence of the witness Dickerson, either on account of his contradictory statements made under oath, or on account of his alleged participation in the murder as an accomplice of the accused. We think the tendency of the recent opinions of the most learned courts is to leave this subject of the credibility of the witness to the jury, under proper instructions and cautions from the court, notwithstanding he may have made contradictory statements under oath, or be an accomplice of the accused. The reasons for holding to this rule would be as potent in this state as in any other, since the legislature has seen fit to declare that even a man convicted of perjury shall be a competent witness, leaving his credibility to the jury under all the circumstances of the case.

The old rule, "*falsus in uno, falsus in omnibus*," was apparently founded upon the other rule, that the person who had been indicted and convicted of willful perjury was not a competent witness in any case; and the courts, in analogy to this rule, were inclined to hold that when it appeared in the course of the trial that a witness had been guilty of perjury, his testimony ought to be excluded in the same manner as though he had been indicted and convicted of such perjury. The rule that the person convicted of perjury is not a competent witness, having been abolished by the statute, and his competency restored, his credibility is necessarily a question for the jury; and it would seem to follow that the witness who may have made false statements under oath, of which he had not been formally convicted, would not become thereby an incompetent witness for all purposes, any more than the witness who had been convicted of perjury, and his credibility must also be left to the jury, under all the circumstances connected with his testimony.

Mack vs. The State.

From an examination of the record in this case, we are strongly impressed with the idea that the learned attorney for the state was unnecessarily technical in his objections to the introduction of evidence, and that the court adopted too rigorous a rule upon that subject. Though it be true that the judge, upon the trial of a criminal case, should not permit the time of the court to be wasted in hearing evidence which is entirely disconnected with and immaterial to the real issues, and which may mislead and confuse the jury, yet, on the other hand, for the furtherance of justice and the protection of the state, a liberal rule should be adopted in the admission of evidence, and no evidence offered by the accused should be rejected when its immateriality is not clearly apparent. The evil of admitting evidence in a criminal action which may, upon a more mature examination than it is possible to give to it upon the trial before the jury, be held irrelevant and immaterial, is comparatively slight when contrasted with the evil result which must follow the rejection of such evidence if upon more mature consideration it be seen that the evidence was material and should have been admitted.

The admission of such evidence, if in fact immaterial, will not be very likely to prejudice the state with an intelligent jury; whereas its rejection, if, upon more deliberation, it is seen to be in fact material, may, as in this case, work a reversal of the conviction, and involve the delay and expense of a retrial, without any possible benefit to the state, and impose the expense and all the harrowing anxieties of a second trial upon the accused, with slight chance of procuring a more favorable result than was reached on the first. It seems to us that in every aspect of the case it is better for the state, as well as for the accused, that the trial court should adopt a liberal course in the receipt of evidence offered by the defense; and that, if the court errs, it should err in liberality rather than in the application of technical and rigorous rules, excluding all evidence which is not clearly seen to be material.

On account of the errors above stated, in the rejection of evidence offered by the accused, the judgment of the circuit court must be reversed, and the cause remanded for a new trial.

*By the Court.*— So ordered.