(61 App. Div. 75.)

### PEOPLE v. MANAHAN.

(Supreme Court, Appellate Division, Fourth Department. April 30, 1901.)

CRIMINAL LAW—BREAKING CANAL FEEDER—EVIDENCE.

    Defendant was indicted for violation of Pen. Code, § 479, prohibiting the destroying or injuring of a canal feeder; the theory of the state being that defendant, who was a hotel keeper, conspired to destroy the canal for the purpose of obtaining profits from the sales of beer at his hotel to workmen who should be employed to repair the same, and proved that three weeks prior to the breaking, defendant had purchased 15 barrels of beer, which was much larger than his usual purchases. *Held*, that it was error to refuse to allow defendant to introduce evidence of the agent from whom he bought the beer that the large purchase was for the purpose of evading the internal revenue tax about to be imposed at the time, and to exclude defendant's evidence to the same effect, and such error was not cured by its subsequent admission, since the court's action might have led the jury to believe that defendant's explanation was not credible.

Appeal from Oneida county court.

Richard J. Manahan was convicted of willfully injuring a canal feeder, in violation of Pen. Code, § 479, and he appeals. Reversed.

The defendant and six others was duly indicted by the grand jury in Oneida county, at a trial term of the supreme court, on the 12th day of February, 1900, under section 479 of the Penal Code, for willful injury to the canals and the canal system of the state, committed on the night of the 22d of May, 1898, at the town of Forestport, in said county. The substance of the facts set forth in the indictment as constituting the felony is that the seven persons indicted, while acting together and in consort, willfully, maliciously, unlawfully, and feloniously dug, or caused to be dug, a ditch across the bank of the feeder of the Black River Canal, and did cut away and destroy the piling and timbers placed in said bank for its support, for the purpose of causing a break in said bank, and did cause such break, whereby said bank, to the length of 80 feet, and to a depth of over 60 feet, was washed, torn, carried away, and destroyed, thereby stopping navigation and causing a break in, and serious damage to, said canal-feeder bank. The defendant, upon being arraigned, February 13, 1900, pleaded not guilty. Upon the former trial the jury disagreed. The second trial was had in the Oneida county court at a term commencing on the 2d day of April, 1900. Upon the trial the people called as witnesses four of the men indicted jointly with the defendant, who testified, in substance, that they dug the ditch across the bank of the canal feeder, as alleged in the indictment, which resulted in the destruction of said bank, as therein alleged, and that they were induced, instigated, and hired by defendant and others to commit the crime. The people gave evidence which sufficiently corroborated the testimony of these accomplices to warrant the jury in accepting such testimony. The defendant was the proprietor of a hotel known as the "Getman House," in the town of Forestport, about a mile and a quarter distant from the point where the breach was made in the bank of the canal feeder. Forestport was the nearest village to the point of the breach. The criminating evidence introduced by the people against defendant consisted of testimony as to oral statements and declarations alleged to have been made by him at different times between the latter part of April and the commission of the crime, and subsequently thereto. This evidence also tended to show that defendant's motive in having the crime committed was the profits he would probably make on the sale of beer, ales, wines, liquors, and cigars at his hotel bar to the men who would be employed in restoring said bank, and in the profits he expected to make from boarding them. Defendant, as a witness in his own behalf, contradicted all of the witnesses called by the people who gave evidence tending to connect him with the crime, and denied that he was in any manner connected therewith. He also called witnesses who corroborated him in the main. The defendant also introduced other evidence which it was claimed tended to show that the break was caused by a freshet, and not by any criminal agency. The court left this question to the jury, and the evidence fairly warranted their determination thereon adversely to defendant. The hotel was purchased by defendant's wife in the month of March, 1898, and he took possession on the 20th day of April thereafter. In addition to the evidence consisting of conversations connecting defendant with this crime, the people also showed that between the latter part of April and the 22d day of May, 1898. the time during which defendant and others were planning the commission of the crime, he purchased a large stock of provisions and supplies for the hotel, and a large quantity of liquors, wines, ales, and cigars; and also, by the testimony of the railway station agent, that there were delivered to defendant on the 3d day of May 5 barrels designated "ale" on the waybill, and on the 10th day of May 10 barrels likewise designated "ale." But it appears that these 5 and 10 barrels were in fact beer purchased from the Ft. Schuyler Brewing Company. The people gave no express evidence as to the length of time such a quantity of provisions and supplies, liquors, wines, ale, beer, and cigars would last such a hotel, or as to the usual quantity of such commodities purchased or kept in stock by such hotel.

The defendant testified that when he took possession of the hotel he was

obliged to purchase an entire new supply of all the various commodities used for food and drink, and that, with the exception of the 15 barrels of beer, to which reference has been made, he did not purchase or have on hand at the time of the commission of the crime charged in the indictment more than the ordinary and usual quantity of provisions and supplies, liquors, wines, ales, beer, and cigars. He also testified that he had been in the hotel business a number of years in small places in the same county, and that at that season of the year he had customarily purchased about the same quantity, with the exception of said 15 barrels of beer. He, however, conceded that the 15 barrels of beer constituted an unusual and extraordinary purchase, made on the 28th of April, 1898, from the Ft. Schuyler Brewing Company, through F. X. Schmelsle, its agent and peddler, and that it was in addition to his regular customary purchases of beer from the breweries with which he had been and was doing business. Defendant called said Schmelsle as a witness, and inquired what he said to defendant at the interview at the Getman House on April 28, 1898, which resulted in the purchase of this beer. This was objected to as incompetent and immaterial, and the objection sustained by the court, and exceptions taken by defendant. Defendant's counsel thereupon stated: "I offer to show by this witness that on the 28th day of April, 1898, at the Getman House, in Forestport, he informed Mr. Manahan, the defendant, that a bill had been introduced in congress increasing the tax on beer one dollar, and he urged him to buy beer, and a quantity of it, in barrels, and that, if any of the beer soured or became unfit for use, they would exchange it without any additional cost to him. On that condition, Manahan ordered fifteen barrels of beer, to be shipped in two lots, one lot of 5 barrels, and one lot of 10 barrels, in the early part of May following, which composed the 5-barrel lot and the 10-barrel lot, which is shown by the people's evidence, before they rested, had been sent to Mr. Manahan, at Forestport, early in May, 1898." Defendant's counsel thereupon asked the witness whether he told defendant "anything in reference to the war revenue bill that had been recently introduced in congress." This was likewise objected to as incompetent and immaterial, and the objection sustained, and defendant excepted. Defendant's counsel thereupon asked the witness whether he told defendant upon that occasion "that the bill provided for an additional tax of one dollar per barrel." Similar objections interposed to this were sustained, and defendant's counsel excepted. Defendant's counsel then asked whether witness told defendant that, "if he would buy in large lots, in case any of the beer spoiled or soured before it was used, that the company you represent would exchange the same without additional cost to him." To this the same objections were interposed, sustained, and defendant excepted. Thereupon, in answer to an inquiry by defendant's counsel as to whether these rulings were to be considered with the same force and effect as if the defendant had given his testimony before the witness was called, the court said: "It is not because of the order of proof. I should make the same ruling if the witness was called after Manahan had been sworn." Defendant then called the manager of the brewing company, and was permitted to show by him that Schmelsle was the agent of the company; but his offer to show, by proper question, that he was the agent traveling through Forestport, was excluded as immaterial, as was also defendant's offer to show, by proper question, that the 5 and 10 barrels of beer were shipped upon an order received from said agent.

Defendant was subsequently called as a witness, and upon his examination the following occurred: "I bought fifteen barrels of beer from the Ft. Schuyler Brewing Company in April, 1898. Frank Schmelsle was the agent. Q. What did Schmelsle say to you upon the subject of buying that beer before you bought it? (Objected to as immaterial. Objection sustained. Exception by defendant.) Q. Did he inform you that there was a bill introduced in the legislature of the United States increasing the tax upon beer one dollar a barrel? A. Yes, sir. By Mr. Curtin: I object to it, and ask that the answer be stricken out. He answered before I had time to object. By the Court: The answer may go out. Q. Did he inform you that if you purchased this ale, and it soured or spoiled, that he would exchange it without extra charge to you; that is, if any of the barrels soured or spoiled? A. Yes, sir. By Mr. Curtin: Objected to as incompetent and immaterial,

-and ask that the answer go out.  By the Court:  The answer may go out. ·(Exception by defendant.)  Q. Were you informed by Schmelsle before you gave the order for the fifteen barrels of beer, on the 28th of April, 1898, that a revenue measure had been introducd in congress increasing the tax one dollar per barrel on beer?  (Objected to as incompetent and immaterial.  Objection sustained.  Exception by defendant.)  Q. Did you purchase the beer .relying upon and believing said information?  (Same objection, ruling, and ·exception.)  Q. Did you understand and believe at the time you gave the ·order to Schmelsle for the fifteen barrels of beer, on the 28th of April, 1898, ·that a revenue measure had been introduced in the congress of the United States which would increase the tax upon beer one dollar per barrel?  (Same objection, ruling, and exception.)  Q. I ask you to state what Schmelsle informed you, if anything, upon the subject of a revenue bill.  By the Court: He can't state what the provision was.  By Mr. Jones:  Q. Give the conversation between you and Schmelsle.  What information did you have upon the subject of a revenue measure at the time you gave the order for the fifteen barrels of beer, if any?  (Same objection, ruling, and exception.)  Q. State what information you had, if any, upon the subject of a revenue measure, and upon the subject of beer, at the time you gave the order for fifteen barrels of beer, on the 28th day of April, 1898.  (Objected to as incompetent and immaterial, and the information sought is collateral and immaterial. ·Objection sustained.  Exception by defendant.)  Q. Why did you order the :fifteen barrels of beer of Schmelsle?  A. I understood there was to be an in- ·crease in the revenue tax of one dollar a barrel at that; time, and I would save a dollar extra by the barrel.  I understood, if any of the beer spoiled, or anything, ·I would have it exchanged free gratis; that is, no extra charges. Q. Schmelsle was the agent of what brewing concern at that time?  (Objected to as incompetent and immaterial.  Objection sustained.  Exception by defendant.)  I gave the order for fifteen barrels of beer to Schmelsle.  He represented the Ft. Schuyler Brewing Company.  It was to come in five barrels in the lot, and ten barrels in the lot.  I traded with other brewers at that time,—the West End Brewing Company and the Utica National Brewing Company."

On the cross-examination of defendant the following occurred: "Q. You ·want to tell this jury, now, that some agent came along and told you that you could save one dollar on a barrel of beer by buying it at that time, and he would take back any that would spoil?  (Objected to as incompetent, after he was asked to ·state what his information was, what the conversa- :tion was, and the evidence was excluded upon their objection, and the agent was called to testify, and his testimony on the subject was excluded upon their objection.  Objection overruled.  Exception by defendant.)  A. He told me he would take any that spoiled.  The agent told me he would take back .the beer that spoiled.  I did not know that the revenue measure did not go into effect until July 1, 1899.  Did not know anything about it.  Did not know when it went into effect, only by my bills.  I will swear that I re- ·ceived a bill before July 1st, with an additional tax upon it.  Think I have it here.  (Witness produces paper.)  That shows that the price of ale and lager was advanced a dollar a barrel June 14, 1898, and that was caused, as I understood, by the revenue bill.  I have been paying an extra dollar from .June 14th until now.  I don't know who put it on the bill.  I got it just as you see it.  Can't say how long I was using up the twenty-one barrels of :ale.  Probably bought four barrels the latter part of June.  Don't think that is' all.  Not likely that I bought any more until I used the twenty-one bar- ·rels up.  Possibly consumed the twenty-three barrels before the month of .June was up.  I probably bought three barrels the 30th of June, if the bill ·shows it.  I have got the bills that would show.  Don't know as I received twenty-three barrels after that in any one month.  Q. Is it not a fact that you never thought about the revenue bill at all until the brewers put up the price of ale and lager?  (Objected to as incompetent.  The agent who sold him the beer on the 28th of April, 1898, was called to prove what informa- ·tion he may have had' upon the subject of increasing the tax on beer, and it was excluded upon counsel's objection.  Objection overruled.  Exception by ·defendant.)  A. No, sir; it is not so."

On his redirect examination, defendant was then permitted to testify as follows: "I bought the fifteen barrels of beer April 28, 1898, on information from the agent in regard to the extra tax of one dollar a barrel. He informed me that the government was going to pass a revenue bill, or that one was pending; that they were going to put a dollar on beer,—tax it a dollar a barrel. He said he thought it would take effect right away; could not tell then when it would pass. Said he was trying to sell his customers a large amount of beer, to save them a dollar a barrel. He told me he wanted to sell me twenty-five barrels, but I finally agreed to take fifteen barrels, and he was to send it as I wanted it. He claimed they would keep it in the brewery for me upon the order I gave at that time, and I could send in an order for them to ship it along as I wanted it, and I could have it at that price. I told him to ship five barrels in a week, and not to ship any more until I sent in an order. He shipped the five barrels just as the agreement was, and in a few days afterwards he sent the ten barrels without any notice."

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Thomas S. Jones, for appellant.
Timothy Curtin, for the People.

LAUGHLIN, J. It is not pretended that defendant was personally present or took any part in the actual destruction of the bank of the canal feeder. It is claimed by the people that he planned the commission of the deed and instigated others to execute it for a financial consideration, towards which he was to contribute $25. In weighing the conflicting evidence and theories presented by the respective parties, the minds of the jurors in such a case would naturally be materially influenced, if not controlled, by the existence or absence of a motive on the part of the defendant. The delivery of this concededly unusually and extraordinary quantity of ale to defendant, who was conducting a hotel in a sparsely-settled community, shortly before the commission of the crime, and during the time its commission was being planned and negotiated, was most damaging evidence against defendant, and, unexplained, would render the contention of the people quite probable. People v. McWhorter, 4 Barb. 338, 440; Cow. & H. Notes to Phil. Ev. pt. 1 (3d Ed.) 473, note 288. The people contended that defendant purchased the beer in contemplation of the commission of this crime, and to be prepared to reap the profits, for the realization of which he became a party to this conspiracy. Defendant, on the other hand, contended that the purchase was entirely innocent. His explanatory evidence was not improbable. The joint resolution for the recognition of the independence of Cuba was passed on the 20th of April, 1898, and the act of congress declaring war against Spain was passed on the 25th of April, 1898, and it declared that a state of war had existed since the 21st day of April. The act authorizing the president to increase the army by the addition of volunteers was passed on the 22d day of April, 1898. The war revenue law of 1898 was signed by the president on the 13th day of June, and it took effect on the following day. Section 1 of this act increased the internal revenue tax from one dollar to two dollars on each barrel of beer. It is quite likely that on the 28th day of April, 1898, when defendant claims the proposition for the sale of this

beer was made by the brewing company to him, the war revenue measure was pending before congress. The proposition which, according to the testimony of defendant, was made to him by the agent of the brewing company, would inure to his benefit and advantage in the event that the revenue on beer should be increased, and he would lose nothing thereby if no change were made in the law. The rulings of the court in excluding the corroborating evidence, and in at first precluding defendant from testifying as to his object and motive in purchasing this beer, were calculated to convey to the jury the impression either that his attempted explanation was of no consequence or importance, or that it was too improbable for them to give credence thereto. The district attorney, upon cross-examination, sought to discredit defendant's explanation, and to convey the impression to the jury that he had no information on the subject of the increase of the price of beer until long after the commission of the crime, and that the increase in price of beer caused by the imposition of an additional revenue tax did not take place until the 1st day of July, 1898. One jury disagreed in the case, and it was conceded upon the argument that this excluded evidence was received on the former trial. Defendant was entitled to have the benefit of such explanation of the purchase and possession of this suspiciously large quantity of beer as he could make, and he was not obliged to go to the jury on his unsupported testimony upon that point. He was entitled to the testimony of the agent and peddler of the brewery company to corroborate him, and to show that the proposition for the purchase of this beer emanated from the brewery company, and not from him. Com. v. Robinson, 1 Gray, 555; People v. Fitzgerald, 156 N. Y. 253, 50 N. E. 846; People v. Dowling, 84 N. Y. 487; Filkins v. People, 69 N. Y. 101; People v. Baker, 96 N. Y. 340; People v. Jackson, 111 N. Y. 362, 19 N. E. 54; Robinson v. State, 53 Md. 151; Mack v. State, 48 Wis. 271, 4 N. W. 449; Brown v. Matthews, 79 Ga. 1, 4 S. E. 13; State v. Waltz, 52 Iowa, 227, 2 N. W. 1102. It cannot be said, as a matter of law, that these erroneous rulings of the court in excluding competent evidence did not materially prejudice defendant. Had the evidence thus erroneously excluded been received, we cannot say that the verdict would have been the same. We are therefore constrained, on account of the exceptions to the exclusion of this testimony, to reverse the judgment and grant a new trial.

The judgment and conviction should be reversed, and a new trial ordered. All concur.