Shiefel, Plaintiff in error, vs. The State, Defendant in error.

*February 10—March 6, 1923.*

Homicide: Evidence: Statements of accused at coroner's inquest:
Res gestæ: Statements of witness who fled from scene.

1. In a prosecution for murder, evidence given by defendant at the coroner's inquest was admissible.
2. Statements of a witness who fled from the scene of the homicide shortly before the encounter between the defendant and deceased, and which were made at a place a quarter of a mile from the scene of the killing and after the witness had had time for reflection, were not a part of the res gestæ.
3. This case, wherein the judgment of conviction is reversed because of the admission of incompetent testimony, and where the question of the guilt of the defendant is very close, is sent back for a new trial if the district attorney shall conclude there is sufficient competent evidence to warrant further prosecution.

Error to review a judgment of the circuit court for Grant county: S. E. Smalley, Circuit Judge. *Reversed.*

Murder. The plaintiff in error was charged with murder in the first degree for the killing of one Joseph Stake on the 9th of December, 1921. The facts were largely undisputed. The plaintiff in error, *John Shiefel,* was a blacksmith and carpenter living at Highland, Iowa county, Wisconsin. Information was filed against his son, William Shiefel, on the same charge, and the two were tried together.

*John Shiefel* was about fifty-five years of age and was married to a sister of Joseph Stake. His son was about twenty-six years of age and was employed as a farm hand much of the time by Joseph Stake. Joseph Stake was a farmer living in the town of Castle Rock, Grant county, about six miles distance from Highland. On the 8th of December, 1921, *John* and William Shiefel were at the residence of Joseph Stake helping him butcher. They stayed all night at the Stake farm. On the morning of the

9th Joseph Stake took his team and wagon and together
with *John* and William Shiefel went to the home of *John
Shiefel,* arriving there about 11 o'clock.   He took with
him a can of milk, which he left at a cheese factory on the
road, about three or four miles from Highland.   The three
men had dinner at the Shiefel home, went into the woods
and got a load of wood for *John Shiefel,* brought it home,
and cut some of it for the household.   They then had sup-
per.   While at supper a man living near Joseph Stake, by
the name of Prohaska, came to the Shiefel home with a
team and buggy.   He remained there until the party had
supper, when *John Shiefel* and Joseph Stake departed in
the wagon for the home of Stake, where *Shiefel* was to do
some work about Stake's house.   William Shiefel and
Prohaska left together in the buggy, going the same road.
Sometime during the afternoon Stake had procured sixteen
pint bottles of near-beer from a brewery at Highland, also
two small kegs of beer.   These he took with him on his
way home.   When out some distance from Highland the
four men stopped and had a bottle of beer each, a little
further on they had another, and still further on, another.
When they reached the cheese factory Joseph Stake stopped
and got out of his wagon and procured the milk can which
he had left there in the morning and put it in his wagon.
In the meantime Prohaska and William Shiefel had gone
on.   When Stake put the can in the wagon he discovered,
or thought he discovered, that some of his beer had been
taken. He immediately became very angry and excited.   He
jumped into his wagon, cursing and yelling.   He ran his
horses at a high rate of speed to overtake Prohaska and
young Shiefel, swearing that he would kill them.   *John
Shiefel* fell out of the seat into the bottom of the wagon
as they went bumping along.   After running the team for
some distance he overtook and passed the men in the buggy.
He then stopped his team and jumped out, and went back
swearing that he would kill the two men.   He attempted

to strike Prohaska, who jumped out over the wheel of the buggy and escaped. Prohaska ran about a quarter of a mile to a farmer by the name of Nechvatal. He went into the house without rapping, appeared excited, and made a statement to Mr. and Mrs. Nechvatal as to what was happening back on the road. He then went upstairs and awakened the hired man by the name of Jerry Brabec, and made a statement. The hired man and Mr. Nechvatal returned with him to the scene of the tragedy. In the meantime Stake had attacked young Shiefel. It is claimed that he struck Shiefel on the head with a beer bottle, grabbed him by his clothes, pulled him out of the buggy, and got him down behind the buggy and pommeled him. Shiefel received two black eyes, his jaw was injured, some teeth were loosened, his lips were bruised, and he claimed that his shoulder was injured. *John Shiefel* claims he heard his boy calling out in distress, and he went back and found the boy lying on the ground back of the buggy and Stake stamping him with his foot. He called out to Stake in protest, when Stake turned on him and swore that he would kill him, and made a lunge at him. He claimed that he took from his pocket a knife, opened it, and used it to defend himself. He claimed that he was in fear that Stake would take his life. Stake was about forty-five years old and a stronger and heavier man than *Shiefel*. While defending himself, as he claims, *John Shiefel* cut Stake about the face in two or three places, and finally Stake grabbed *Shiefel* and they went to the ground together, Stake falling partly on top of *Shiefel*. At this time it appears that Stake received a fatal stab between the ribs from the knife in *Shiefel's* hand. *Shiefel* disengaged himself, got up, and went to see what had happened to his son. He claimed that he did not know that Stake had been fatally stabbed, but thought that he had bumped his head on the frozen ground. He found the boy partly up, who cried out that his face was

broken. About this time he heard calls from Stake for help, who claimed that he was dying. The father and son attempted to assist Stake to his feet but he was helpless. They covered him with a blanket and the older *Shiefel* started for a doctor. He met Prohaska and his two companions and asked them to call a doctor. They first went to see the condition of Stake, and found him dead or dying. A doctor was called, and he found Stake dead from the knife wound in his breast. An undertaker was called, who moved the body to Highland. The sheriff, a deputy, and one or two others also arrived. The next day, at the request of the sheriff, the two Shiefels and Prohaska went to Lancaster and were taken by the sheriff to the coroner, who held an inquest. At the request of the coroner they testified under oath as to the tragedy. They were examined by the district attorney and their testimony was taken by the circuit court reporter, who was directed thereto by the coroner. At the conclusion of the testimony the two Shiefels and Prohaska were arrested on a warrant charging them with the murder of Stake. Later the three men, upon examination, were bound over for trial in the circuit court. As stated, *John* and William Shiefel were tried together and Prohaska's case was deferred. At the beginning of the trial a transcript of the testimony of *John Shiefel,* taken at the inquest, was read by the reporter, who testified that it was a correct transcript of the testimony. This was over the objection of the defendant.

Mrs. Nechvatal testified on behalf of the state to the conversation of Prohaska at the Nechvatal residence during the night of the killing. Jerry Brabec also testified to the statements of Prohaska to him at the Nechvatal residence on the same night. This testimony was also given over the objection of the defendant. The evidence discloses that *John Shiefel* was reputed to be a peaceful, law-abiding citizen, and that Stake, the deceased man, was quarrelsome

and a dangerous man in a fight. It also discloses that *John Shiefel* and Stake had been on friendly and intimate terms for years and that there was no bad blood between them.

The court submitted to the jury for the verdict, murder in the first degree, murder in the second degree, and manslaughter in the second degree. The jury rendered their verdict acquitting William Shiefel and finding *John Shiefel* guilty of manslaughter in the second degree, which offense is defined by statute to be:

"Any person who shall unnecessarily kill another either while resisting an attempt by such other person to commit any felony or to do any other unlawful act, or after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree." Sec. 4351, Stats.

The court sentenced the plaintiff in error, *John Shiefel,* to five years in the state prison, and the plaintiff in error brings this case here on writ of error. He assigns as error that the court erred in admitting improper evidence; in overruling the motion for a new trial; for failure of evidence to sustain the verdict; and in refusing instructions to the jury as requested.

For the plaintiff in error there was a brief by *McGeever & McGeever* of Dodgeville, and oral argument by *James D. McGeever* and *William C. McGeever.*

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *George B. Clementson,* district attorney of Grant county, and oral argument by *Mr. Messerschmidt.*

CROWNHART, J. The plaintiff in error claims that the testimony given by him at the inquest was inadmissible at the trial for the reasons that it was given while under duress and because he was not apprised of his constitutional right to sit mute. This court has held otherwise. *Mack v. State,* 48 Wis. 271, 4 N. W. 449; *Dickerson v. State,* 48 Wis. 288, 4 N. W. 321; *State v. Glass,* 50 Wis. 218, 6 N. W.

500; *Emery v. State,* 101 Wis. 627, 78 N. W. 145; *Anderson v. State,* 133 Wis. 601, 114 N. W. 112; *State v. Lloyd,* 152 Wis. 24, 139 N. W. 514.

The plaintiff in error also assigns as error the admission of the testimony of Mrs. Nechvatal and Jerry Brabec as to statements of Prohaska, which he claims to have been mere hearsay. The state contends that such evidence was admissible as a part of the *res gestæ*. When Prohaska made his declarations he had gone about a quarter of a mile from the scene of the tragedy. The length of time after the happening of the events which he witnessed, and the distance from the place, were such that it cannot be said that such statements were a part of the picture of the scene. His statements were not the spontaneous outcome of the fracas. He had had time for reflection and to arrange his story as his interest might dictate. He had been in the melee. He might be under temptation to color the facts. The reason of the rule of *res gestæ* was absent. The rule is based on the experience of mankind that statements made at the time of the happening of an event and as a part of the event itself are apt to be truthful and give a flashlight, as it were, of the event itself. See Bouvier, Law Dict.; 10 Ruling Case Law, 974; *Johnson v. State,* 129 Wis. 146, 108 N. W. 55. But in a criminal case where the prisoner's liberty is at stake, it would be unsafe to extend the rule to the length that was allowed in this case. Much must be left to the discretion of the trial court in such cases, but we are of the opinion that the bounds of discretion were here exceeded. The error was prejudicial. Mrs. Nechvatal testified:

"He said, 'Matt, come out there. They are fighting,' and in, a little while Joe hollered for help; he said, '*John,* take care of me, I am dying. And go after Matt.' That is what *John* said when he came in."

This statement did not accord with the evidence of Prohaska or *John Shiefel* on the trial. There was no evidence

that either *John* or William was fighting. William was knocked unconscious, with no evidence that he ever struck a blow. *John Shiefel* was not fighting—he was merely trying to ward off the attacks of his assailant. Stake had not been injured when Prohaska left, nor for some time afterward, and so he had not cried out "I am dying. Go for Matt." Quite plainly the witness was mixing up what Prohaska said with what she had heard at other times and other places. Certainly her testimony does not accord with that of the three actors on the scene nor with the probabilities. The jury may well have thought that there had been a fight between Stake on the one side and the two Shiefels on the other, in which case the two men could protect themselves against the one without the necessity of killing their opponent.

The court is impressed that on the evidence the question of the guilt of the plaintiff in error presents a very close question. Hence the testimony improperly admitted may have turned the scale. It must be remembered that the jury acquitted the plaintiff in error of killing with malice, of killing in disregard of human life, or of killing in heat of passion. He killed in self-defense, but the jury found that he did not need to go so far as to kill his assailant. This is the close question, whether *Shiefel,* under the evidence, which must establish guilt beyond a reasonable doubt, could not have believed his life was endangered to the point of using his knife so as to produce a possible fatal wound. We are asked to hold the evidence insufficient and discharge the prisoner.

After full consideration of all the evidence we have concluded to send the case back for a new trial, if the district attorney shall conclude that there is sufficient competent evidence to warrant further prosecution.

The objection to the charge of the court is not well founded. The charge as given was pertinent to the facts and proper.

*By the Court.*—Judgment reversed, and cause remanded for a new trial. The warden of the state prison will deliver the plaintiff in error, *John Shiefel,* to the sheriff ·of Grant county, who is directed to keep the said *Shiefel* in his custody until discharged therefrom by due process of law.