Emery and another vs. The State.

EMERY and another, Plaintiffs in error, vs. THE STATE, Defendant in error.

*December 21, 1895 — January 7, 1896.*

*Criminal law and practice: Reasonable doubt: Instructions to jury: Evidence: Preliminary examination: Argument of counsel.*

1. The jurors in a criminal case must use all the reason, prudence, and judgment which a man would exercise in the *most important* affairs of life, and an instruction authorizing the use of any less degree of reason, prudence, and judgment is erroneous. Thus, it was error to charge that there is a reasonable doubt when, upon the whole evidence, the judgment and conscience are not convinced of guilt in a degree or to an extent such as would lead a careful and prudent man to act affirmatively in *important* matters of his own.

2. A defendant in a criminal case who admits having made an incriminating threat testified to by witnesses for the state, is entitled to show the circumstances under which it was made, the accompanying conversation, if any, which called it forth, and the information on which it was based.

3. Sec. 4786, R. S. (providing that the magistrate holding a preliminary examination shall "examine the complainant and the witnesses to support the prosecution," etc.), is directory only; and the examination of a sufficient number of witnesses to justify the magistrate in binding over the accused for trial is a sufficient compliance with the statute, even though the complaining witness and some of the other witnesses for the state are not examined.

4. In opening the case for the defense, after the testimony for the state is in, defendant's counsel is not entitled to review such testimony for the purpose of showing that it does not warrant a conviction, but may comment thereon only so far as may be necessary to show the relevancy of the testimony which he expects to introduce.

5. On a trial for murder the state may introduce parts of the testimony of the defendant at the coroner's inquest, without introducing the whole thereof — the defendant being entitled to introduce the remainder.

6. On the day after the arrest of one charged with murder the sheriff said to him, "I am satisfied in my own mind that your gun did the shooting," and he replied "It looks so, don't it?" An objection

on the trial to evidence of this conversation on the ground that its effect was to introduce the opinion of the sheriff is *held* untenable, the reply being in the nature of an admission and intelligible only in connection with the sheriff's remark.

ERROR to review a judgment of the circuit court for Wood county: W. F. BAILEY, Judge. *Reversed.*

The plaintiffs in error were convicted of murder of one Peter Houston on the 2d day of June, 1893, and bring their writ of error. Upon the trial of the case it appeared without contradiction that Peter Houston, the deceased, while sitting in his own house, about twelve miles southeast of Grand Rapids in Wood county, was shot by some person on the outside of the house. At the time of the homicide, Peter was seated near an open window covered by mosquito netting. He was about twenty-one years of age, and his wife, Emma, whom he had married April 4, 1893, was sitting at a table near her husband at the time of the shooting. Peter and his wife had just finished eating a light supper, and night was rapidly falling, it being somewhere between 8 and 9 o'clock, when a gun loaded with buckshot was discharged from some place outside of the house, and seven of the shot entered Peter's face and neck, causing instant death.

The plaintiffs in error, *Emery* and *Lord,* lived about 100 rods straight east of Peter's house on the main road leading from Grand Rapids to Plainfield, which ran east of south. This road united with a road running past Peter Houston's house, about one and a half miles north of *Emery's* and *Lord's* home, and the same distance from Peter's home. There was no road leading directly across from Peter's house to the residence of *Emery* and *Lord,* but a little distance north there was a crossing between the two roads, making the distance between Peter's house and *Emery's* house, which could be traveled by vehicles, about three fourths of a mile. *Emery* was at the time of the tragedy about forty years old, and with his wife and two boys, aged

eight and ten years respectively, lived upon and worked the farm of the plaintiff in error *Lord*. *Lord* was a widower, about sixty-two years old, and lived with *Emery* and his family. He had lived upon this place for upwards of twenty-five years, while *Emery* had resided there and upon an adjoining farm about eighteen years. Emma, the wife of the deceased, was the daughter of David Jacobs, who, at the time of the tragedy, lived about three miles north of the Houston and *Emery* residences, on the main road leading to Grand Rapids. There were no houses on the road between Jacobs's place and Peter's place, nor between Jacobs's place and the residence of the plaintiffs in error. The road running south past Jacobs's house divided into two roads about midway between Jacobs's place and Peter's place; one of said roads passing in a southeasterly direction past *Emery's* place, and the other in a southwesterly direction past Peter's place.

David Jacobs lived alone with his son, James, who was about twelve years of age, upon a rented farm, at the time of the tragedy. He had come into the community with his daughter, Emma, and son, James, in the summer of 1892. During the fall and winter of 1892, Jacobs and his family lived on the *Emery* farm, which was about a quarter of a mile south of the *Lord* residence, and there became acquainted with *Lord* and *Emery*, and visited back and forth. In the spring of 1893 they removed to the farm on which Jacobs was living at the time of the tragedy, called the King place. There was evidence tending to show that, while Emma was living with her father on the *Emery* place, she became criminally intimate with *Lord*. There was also evidence tending to show that David Jacobs had insisted upon having criminal intercourse with Emma since she was about fourteen years of age. The evidence further showed that *Lord* and *Emery*, on one side, and Peter Houston and his father, on the other side, had been on unfriendly terms

for a long time, and that threats had been made on both sides.

On the 4th day of April, 1893, Peter Houston and Emma Jacobs were married, and for about four weeks after that time they lived with her father upon the King place, under an arrangement by which they were to carry on the farm together. In the first part of May, however, trouble arose between Peter and his father-in-law, and Peter and his wife left the Jacobs place, and moved down to the small house where the murder was committed. This house was about thirty rods from the house of his father, William Houston, where lived William Houston, his wife, and Peter's two brothers, and one sister. The land around Peter's house was uncultivated and unfenced, and had upon it scattering jack pine and scrub oak. The testimony tends to show that the difficulty between Peter and his father-in-law was that Peter found out or suspected the improper relations existing between his wife and her father. Whatever the difficulty was, they parted evidently with bad feelings on both sides.

On the day after the murder, a coroner's inquest was held, at which the plaintiffs in error and said Jacobs were all sworn as witnesses, and all denied any knowledge of the crime. Near the side of Peter's house where the shot was fired, two gun wads were found,— one of pasteboard, and one of felt. The evidence tended to show that these wads were of the size used in loading cartridges for a breech-loading twelve-gauge gun; and the sheriff having found such a gun in the possession of *Emery*, apparently recently discharged and again loaded with buckshot of the same kind with which Peter was shot, *Emery* was arrested, charged with the crime, and, having waived examination, was committed to await trial. *Lord* was not arrested, but still continued to live upon his farm.

David Jacobs and his son, James, after remaining upon

the King place until the fall of 1893, removed to Vernon county, in this state. Emma Houston, wife of the deceased, went to live with her father-in-law. On the 8th day of March, 1894, Emma Houston made complaint before a court commissioner charging her father with having committed the crime of rape upon her March 21, 1893, upon which complaint a warrant was issued, and David Jacobs was arrested in Vernon county, and confined in jail at Stevens Point, Portage county. During his confinement under this charge, he made a confession in which he stated that the murder of Peter Houston was committed by *Emery*, himself and *Lord* being present, aiding and assisting in the crime. Upon the making of this confession, he was taken before the circuit court then in session at Waupaca county, and pleaded guilty to the crime of murder of Peter Houston, and was sentenced to the state prison at Waupun for life. This was on the 14th of March, 1894; and on the 16th of March following William Houston made complaint before a justice of the peace charging *Lord* with the same crime; and he was arrested, and examination thereafter had. He was bound over for trial to the circuit court.

The plaintiffs in error were tried together at the October term, 1894, of the circuit court for Wood county. Jacobs was called as a witness, and gave direct evidence against them, in accordance with his previous confession. The plaintiffs in error denied all complicity in or knowledge of the crime. There was circumstantial evidence and evidence of threats and ill will. A verdict of guilty was rendered against both defendants, and they were sentenced to state prison for life.

*Geo. L. Williams*, for the plaintiffs in error.

For the defendant in error there was a brief signed by the *Attorney General*, and by *B. J. Goggins* and *Geo. R. Gardner*, of counsel, and oral argument by the *Attorney General* and *Mr. Gardner*. To the point that counsel for

the defendants in opening their case had the right to comment on the testimony already in only so far as necessary to show the relevancy of the testimony they expected to introduce, they cited *State v. Hoyt*, 47 Conn. 535; *Dille v. State*, 34 Ohio St. 620; Abb. Trial Brief (Crim.), § 323; *People v. Anderson*, 44 Cal. 65; *People v. Bezy*, 67 id. 223; Best, Right to Begin & Reply, 81; *State v. Zellers*, 7 N. J. Law, 220; *Ayrault v. Chamberlain*, 33 Barb. 229; 3 Wait, Pr. 114, 115; *Kaime v. Omro*, 49 Wis. 371; *Lewandowski v. State*, 71 Wis. 441.

Winslow, J. There was sufficient evidence to sustain the verdict, and the trial seems to have been in most respects fair and just, but there were two rulings made which, we think, were erroneous, and which necessitate reversal of the judgment.

1. The circuit judge charged the jury on the subject of reasonable doubt as follows: "All men are presumed to be innocent of crime. No man can rightfully be convicted of crime until the legal presumption of innocence just mentioned shall have been overcome, and his guilt affirmatively proven beyond a reasonable doubt. Such proof of guilt can be made only by the evidence given or received on the trial of the case, and must be, in the judgment of the jury, the just and reasonable logic and effect of the whole evidence. The 'reasonable doubt' mentioned beyond which guilt must be affirmatively proven in order to justify a verdict of guilty means, as its name implies, a doubt resting in reason; and it must arise from the whole evidence fairly and rationally considered. When, after a full and impartial consideration of the whole evidence considered within the rules already stated, the judgment is convinced to a moral certainty that the accused is guilty, that there is no reasonable explanation of the facts proven except upon the hypothesis that the accused committed the crime charged, then every ' reasonable

doubt' is removed, and a verdict of guilty should follow. Mere fanciful or speculative doubt,— such as a skeptical mind may suggest in any case, however strong and convincing that the accused is guilty the evidence, as a whole, may be to a reasonable and impartial mind,— does not amount to a ' reasonable doubt,' within the meaning of the law. A doubt such as this — one that ignores a reasonable construction of the whole evidence, proceeds upon mere speculation or suspicion — is unreasonable, would acquit one proven guilty as easily as one not so proven, and does not justify a verdict of not guilty." So far the charge is unexceptionable. The judge then proceeded, however, as follows: " On the other hand, *when, upon the whole evidence, the judgment and conscience are not convinced of guilt in a degree or to an extent such as would lead a careful and prudent man to act affirmatively in important matters of his own,* when the jury feel that upon the whole evidence, rationally considered, guilt is not satisfactorily proven, such feeling amounts to a reasonable doubt of guilt, and in such case the defendants will be entitled to a verdict of not guilty." This latter proposition qualifies all that goes before it on that subject, and it is in direct conflict with the rule of law as laid down by this court in the case of *Anderson v. State,* 41 Wis. 430. It was there held that the jury should be charged that they must scrutinize the evidence with the utmost caution and care, bringing to that duty the reason and prudence which they would exercise in the *most important affairs* of life,— in fact, all the judgment, caution, and discrimination they possessed; and if, after such scrutiny, they entertained no reasonable doubt of the guilt of the accused, they should convict; otherwise, acquit. An instruction in that case which gave to the jury as a guide " that prudence and reason which govern you in the ordinary conduct of your affairs" was distinctly condemned, and the judgment was reversed upon that ground alone. The rule laid down in that case has not been

Emery and another vs. The State.

departed from nor qualified since. It is squarely applicable
to the present case, and it necessitates a reversal of the judg-
ment. It is unnecessary to discuss the reasons of the rule.
We are aware that courts in some of the states hold to a dif-
ferent rule, but in this state it has been deliberately declared
that a juryman in a criminal case must use all the reason,
prudence, and judgment which a man would exercise in the
*most important* affairs of life, and that an instruction au-
thorizing the use of any less degree of reason, prudence, and
judgment is erroneous. In support of this rule, see, also,
*State v. Dineen,* 10 Minn. 407; *Comm. v. Miller,* 139 Pa.
St. 77.

2. Witnesses were called by the prosecution, who testified
to having heard the defendant *Emery,* during the winter be-
fore the homicide, remark that if he met Peter Houston in
the woods, and they both had guns, he would see that Peter
did not get the first shot. When *Emery* was put on the stand
in his own behalf, he admitted that he might have made
such a remark, and was then asked what was the occasion
of his making it. This question was objected to, and the
objection sustained, and exception taken. The following
colloquy then took place: " *Ques.* Why do you say you may
have said that? (Objected to as before. Overruled.) *The
Court:* You need not tell anything you heard previous to
that, if you did hear anything. *Ans.* Because I might have
said it. *Q.* If you are limited to not giving the conversa-
tion, you cannot give it in any other way? *A.* No, sir." It
is very apparent that the court, by these rulings, excluded
everything else that was said by either *Emery* or others at
the time of the making of the threatening remark, as well as
excluded everything that had come to *Emery's* knowledge
which prompted him to make it. That the balance of the
conversation was admissible there can be no doubt. Where
the plaintiff introduces evidence of a remark made by the
defendant, the defendant may unquestionably on his own be-

half give the entire conversation, even though it may contain self-serving statements. *Plano Mfg. Co. v. Frawley*, 68 Wis. 577; 1 Greenl. Ev. § 201. The evidence of the threat was introduced by the state to show the state of the defendant's mind, to show that he had malice in his heart against the deceased, and hence that he had a motive to kill him; in short, it was to show intent. Now, when the intent or motive of a party in doing a particular act or making a declaration becomes material, it is always permissible for the party to be sworn in regard to it. 3 Rice, Ev. § 288. The defendant could therefore have testified directly as to his intent or feeling toward the deceased when he made the remark, and we think he was also entitled to show what was the occasion of his making it, and the reason that prompted it, even though such reason might involve the introduction of testimony which would otherwise be hearsay. Certain it is to our minds that a defendant who admits having made an incriminating threat is entitled to show the circumstances under which it was made, the accompanying conversation, if any, which called it forth, and the information on which it was based.

There are numerous other assignments of error made on the part of the plaintiffs in error. We have carefully examined them, and do not find them to be well taken. We shall now briefly notice some of the more important of these contentions.

(1) There was a plea in abatement made by the defendant *Lord* to the effect that he had had no preliminary examination. This plea was based on the grounds — first, that the complaining witness was not sworn on the examination; second, that all of the witnesses for the state were not sworn; third, that the defendants were deprived of the testimony of a material and important witness named James Jacobs, upon such examination, by the acts and direction of the district attorney of Wood county. This plea seems to have been

tried upon affidavits and on the justice's record. R. S. sec. 4786, provides that the magistrate holding a preliminary examination shall "examine the complainant and the witnesses to support the prosecution on oath in the presence of the party charged." It is claimed by the plaintiffs in error that this statute is mandatory, and that, unless the complaining witness and all the witnesses known to the state are examined, no legal preliminary examination is had. It is sufficient to say that we cannot agree with this contention. We regard the statute as directory only. A sufficient number of witnesses were examined to amply justify the magistrate in binding over *Lord* for trial, and this must be held to satisfy the statute. Such was the holding in Michigan under a similar statute. *People v. Curtis*, 95 Mich. 212. As to the claim that the defendants were deprived of the testimony of James Jacobs by the acts and directions of the district attorney of Wood county, it is sufficient to say that the fact was not proven.

(2) At the close of the testimony on the part of the state, and before the introduction of the evidence for the defense, the defendants' counsel claimed the right to review the testimony on the part of the state for the purpose of showing that it did not warrant a conviction. Upon objection, the court ruled that, in opening the defense, he could only comment on the testimony already in so far as it might be necessary to show the relevancy of the testimony which he expected to introduce. This was plainly right, and is in accordance with the established practice within this state. It is no infringement on the constitutional privilege of being heard by counsel. It is simply a rule which manifestly is conducive to the orderly and logical mode of conducting a trial, by which the arguments upon the merits are all to be made after the testimony is in and all the facts are before the jury.

(3) The state was allowed to introduce certain parts of

the statements under oath made by the defendant *Emery* at the inquest, it being objected by the defendant that the state must introduce the whole of the testimony or none. This was not error. The point was directly decided in *Rounds v. State*, 57 Wis. 45. The defendant was entitled to introduce in evidence the remainder of the statement, and did do so.

(4) The state was allowed to prove a conversation between *Emery* and the sheriff on the day of *Emery's* arrest, in which the sheriff said to *Emery*, "I am satisfied in my own mind that your gun did the shooting," to which *Emery* replied, "It looks so, don't it?" It is objected that this evidence was inadmissible, as its effect was to introduce the opinion of the sheriff as to whose gun did the shooting. We do not regard the objection as tenable. The answer of *Emery* partook of the nature of an admission, hence was proper evidence against him; but it could only be understood in connection with the sheriff's remark to which it was a reply.

We do not deem it necessary to notice any other points made.

*By the Court.*— Judgment is reversed as to each plaintiff in error, and the cause is remanded to the circuit court for a new trial. The warden of the state prison will deliver the plaintiffs in error to the sheriff of Wood county, who will hold them in custody until discharged therefrom by due process of law.