WILSON, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 20—October 14, 1924.*

*Criminal law: Venue: Rape: Instructions: Singling out testimony of one witness: New trial: Newly-discovered evidence: Diligence: Discretion of court: Evidence: Conversations, portions of which have been offered.*

1. In a prosecution for rape, instructions which told the jury that they had a right to consider defendant's great interest in the result of the trial and the temptation to color or distort the facts, and also to consider complainant's interest though different, and the interest of other witnesses affecting the credibility and weight of their testimony, did not improperly single out defendant's testimony nor direct the application to it of tests different from those applied to other testimony. p. 645.

2. An instruction which, in distinguishing between rape and fornication, stated that "rape is a brutal crime, standing next in the category to murder," is not erroneous, as it is a mere statement of a plain truth.    p. 645.

3. Under the circumstances of this case, the denial of a new trial on the ground of newly-discovered evidence because of lack of diligence to procure such evidence in advance of trial is considered within the discretion of the trial court.    p. 646.

4. The affidavit of one juror and the written statements of seven others that it was their belief that defendant's case had not been fully and properly presented, do not constitute grounds for granting a new trial.    p. 646.

5. When one party gives in evidence a portion of a conversation material to the controversy, the other may give the whole thereof or at least so much as has any relation to the portion already offered.    p. 647.

6. The state having proved a conversation with the brother of the complaining witness wherein defendant offered to settle, it was error to exclude the testimony of defendant as to such conversation where negotiations for the settlement were with complainant's knowledge, and for the court to assume, in excluding the testimony, that the conversation related only to a settlement for support of a child to which the complainant had given birth. p. 648.

ERROR to review a judgment of the circuit court for Oneida county: A. H. REID, Circuit Judge. *Reversed.*

The cause was submitted for the plaintiff in error on the brief of *A. J. O'Melia* of Rhinelander, and for the defendant in error on that of *John W. Kelley,* district attorney of Oneida county, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general.

JONES, J. This was a prosecution for rape, alleged to have been committed in Oneida county on April 30, 1922. The home of the complainant was at Dale in this state and at the time of the trial she was twenty-two years old. She went to Oneida county during April of the same year, having no acquaintances except her brother who was living there. She was working for Mr. Broome, whose wife was temporarily absent, and the house was occupied by himself and three children. The complainant testifies that on the evening of April 30th she went to a dance at Lake Julia, in a car driven by the defendant, with him, her brother, and Ray Moe. The others called for her about 7 o'clock. The complainant testified that:

"We was out there to the dance, and I see that they weren't very respectable people that were there, so many were intoxicated, and I knew that my father wouldn't be in favor of me being in any of that kind of company, because I never was before. Around 10 o'clock we left, *Mr. Wilson* and my brother and I, and we left my brother off at Sam Samuelson's. *Mr. Wilson* was asked to take me home. I was sitting in the front seat with *Mr. Wilson.* And as he drove up Oneida street I recognized the street, and he turned

off to his left. I said, 'You aren't taking me home.' He said, 'Yes I am,' but he still drove on. He said, 'I will take you out to the fair grounds and show you what we have out this way.' I said, 'No, take me home.' I begged of him to take me home, but he drove right on. He said, 'I will take you home when I am through with you.' He drove out to the middle of the fair grounds. What could I do? I wasn't very strong. I don't know what happened to me. He threw me—dragged me out of the car and on to the ground, and we struggled. I struggled with him. And finally I thought I would run. But he grabbed me, and he dragged me back into the car, first into the front seat and then into the rear seat. When he had me there I don't know what happened to me, but he threw a handkerchief over my face, and that is all I knew. I was unconscious from that time on. I don't know what happened. I didn't know anything until I got home and found myself lying on the bed with all my clothes on, what few I had left on me that was not completely torn. . . . My blouse was all torn to pieces, and the light pongee bloomers I had on were all torn to pieces. . . . My bloomers were bloody and my body was bruised, and I had a scratch on my arm. . . . He pulled me out of the car, threw me on the ground, and tried to pull my bloomers off from me. And I always fought him off, and I got away from him and I fought back in the car. First I·did. I tried to run and he grabbed me again, and then he pulled me in the rear seat and pulled my bloomers down again, and I fought him off. I screamed and hollered. Who could hear me out in the middle of the fair grounds at that time of night?"

The complainant further testified that before she went to the dance there were no marks or scratches on her body, her clothing was not torn, and there was no blood on her body; that she kept her clothing until November 6, 1922, when she destroyed it; that after going to and returning from the dance she rode in the front seat with the defendant; that the next thing after knowing she was in the rear seat of the car, she was in bed with her coat and hat on in her own room, and that the defendant must have taken her

home; that the room was located near the front door and that Mr. Broome's room was next to hers, where the children slept also; that her clothes were hanging in the closet; that she told no one what happened at the fair grounds; that next morning she was not able to get breakfast and later on was crying, and Mr. Broome asked her what she was crying about but that she did not tell him; that she did not tell her parents at all; that she stayed in Rhinelander about a month after this; that Mrs. Broome came home four or five days later and that she went and stayed at the Bye's; that she saw the defendant after April 30, 1922, but that he did not take her to the station when she left Rhinelander and that she did not remember saying good-by to him or his asking her to drop him a card; that she did not afterward write to the defendant, but later testified that at the time she wrote to him she wanted money to take care of the hospital expenses; that she gave birth to a child on January 21, 1923. The complainant further testified that the defendant's attorney went to Milwaukee to see her and again at Appleton; that she did not tell the defendant's attorney that she would be willing to settle the case, but told him to go and see her father about it; that she was willing to settle for $1,500 provided that the defendant would sign a statement; that she was corresponding with her brother, but did not say anything to him about the affair until she wrote from the hospital at the time her child was born, nine or ten months afterward; that she did not remember the defendant taking Mrs. Bye and herself to the station in his car, but that he might have done so. The following testimony was given by the complainant:

"*Q.* This talk about money settlement. The only money-settlement talk you had was for the care of the child, is that true? *A.* What was that? *Q.* The only money-settlement talk you had was something to take care of the child? *A.* Yes. If it wouldn't be adopted I had to have something."

The complainant further testified that she had admitted

to the defendant's attorney that she had had intercourse with another man before when she was a child thirteen or fourteen years old.

Arthur Stocker, the brother of the complainant, testified that he knew the defendant and had roomed with him for two years; that they went around together a good deal, and that on several occasions before April 30, 1922, he and his sister and the defendant had been out together to a place where beer was sold and that they all drank beer; that they were rooming together on April 30, 1922; that the defendant was then running a taxi; that he paid the defendant for the drive on April 30, 1922; that they came back about 10 o'clock in the evening in the defendant's car, and that on reaching his home the defendant said, "I will take Valda home;" that he saw his sister the next noon, but that she told him nothing and said that she wanted to go home; that in May, 1923, the defendant showed him a letter that he had received and told him that it was not true that he had got the complainant into trouble; that he, the defendant, had had nothing to do with it, but that the defendant afterward admitted that he had had intercourse with the complainant, but denied that he had misused her; that on the Sunday before the trial he had a talk with the defendant, who wanted to settle, but he replied that his sister did not want to settle. The witness further stated that he had received a letter from his sister on May 8, 1923, which stated that the defendant had dragged the complainant out to the fair grounds and misused her there and that was the first mention she made of it to him; that he did not remember her saying good-by to *Wilson* nor that she engaged him to take her to the station.

William Broome testified that he did not know what time the complainant came home on the 30th of April, 1922; that in the morning he called her to get breakfast and found her crying and asked her what was the matter and whether she was homesick, and that she said "Not exactly," and said

that it was the company that her brother took her in the night before; that he asked her who it was, and that she said *"Frank Wilson* and they were out;" that she appeared to have been crying all night, her eyes and nose being red; that the next evening he went to her closet to get his suit and noticed some clothes in the corner with blood on them, but that he did not examine them; that he paid no attention except to see that there was blood on the clothes.

The defendant testified that he was thirty-seven years old and had lived in Rhinelander for twenty-seven years and was engaged in the taxi business; that the brother of the complainant had never stated to him that he had received a letter from his sister stating that she had been raped, and that the brother never mentioned anything about the matter to him; that on returning after the dance and leaving Stocker, he drove the car down Oneida avenue and asked the complainant if she would go for a ride; that the complainant consented and that they drove to the fair grounds and that she steered the car; that they had been out to the beer farm on several occasions and that the complainant had liked to drive, and that he held his foot on the accelerator while she steered the car; that on this occasion he had his arm around her and fondled her and that she did not object; that after they were at the fair grounds they were kissing each other and while there had intercourse in the front seat of the car; that when they got home they kissed good night and she got out and went into the house; that afterwards he met her and Mrs. Bye and took them home; that before going away she bade him good-by; that he did not hear from her again until she wrote him a letter in which she said she was about to have a baby, but said nothing about being abused; that there were several letters of this kind, but that the matter was dropped until a few weeks ago when he was called to the district attorney's office and told that the attorney had a letter from the complainant and that she wanted money. He testified that he did not have the letters which he had re-

ceived, but that he had destroyed them all except one which he had given to the complainant's brother; that he did not deny having intercourse with the complainant.

After the verdict there was a motion for a new trial setting up the alleged errors and based in part on certain affidavits. We shall only outline the substance of these affidavits. There was one by the defendant stating that he had been advised before the trial that there was no possibility of his conviction and that no preparation was necessary other than that which was made, and that he acted on this advice and learned only after the trial of such further preparation and evidence as disclosed in the affidavits. In the affidavit of Nina Grossman it was stated that she was a distant relative of the complainant and had known her a number of years and visited with her and been in her company; that during the early part of the summer of 1921 the complainant stayed at the home of the affiant, and while there she discovered from the materials used and the actions of the complainant that there was something wrong and that the complainant admitted that she was affected with a disease which affected the genital organs, and that she accompanied the complainant to a doctor, since deceased, who advised her that the disease was the one suspected and as to the manner in which she should treat herself. The affidavit further stated that she had known of the complainant being in the company of men who were drinking and of them obtaining liquor from a house of disrepute. There were other statements in the affidavit as to belief that there were a number of reputable citizens who would testify that the reputation of the complainant for truth and morality was not good. In the affidavit of Vern McLaughlin it was stated that on a number of occasions he had seen the complainant drinking intoxicating liquors, which were carried by the men in whose company she was; that if the opportunity were had, valuable information relative to the reputa-

tion and character of the complainant could be obtained at Dale and also information as to her plans and those of others to obtain money from the defendant. The record also contains an affidavit by Herman Maas, one of the jurors, stating that he and six others voted that the defendant was not guilty on the first ballot, but that finally the affiant voted to convict because of his inability to prove the innocence of the defendant, believing that was necessary to sustain the vote of not guilty; that the affiant felt that the defendant did not have his case fully prepared and properly presented. Seven other jurors signed a petition representing to the court, among other things, that it was their belief that the evidence was not without some doubt and their feeling that the defendant did not have his case properly presented, and that if this were done it would have been possible to reconcile the evidence with the defendant's innocence; that it was their feeling that the defendant should have a new trial to more fully and properly present his case.

We have not detailed all of the testimony given at the trial, but enough of it, we believe, to fairly present the issues and the legal questions involved. It is one of the assignments of error that the venue was not proven. Whether there was sufficient circumstantial evidence to establish the venue beyond any reasonable doubt it is unnecessary to decide, since, as will be seen, we hold that there must be a new trial on another ground. If there should be a new trial, it is probable that such proof can be furnished as will not leave the question to depend on such evidence as was relied on in this trial. Of course it is elementary that proof of venue is a necessary element to conviction in criminal cases; but it is proof which, through inadvertence, the district attorneys too often fail to produce when it could be easily given.

Exceptions were taken to the following instructions:

"In considering the testimony of the defendant you have

a right to consider his great interest in the result of this trial and the temptation arising under such circumstances to color or distort the facts so as to favor himself."

"The complaining witness, Valda Stocker, must be presumed to also have an interest in the result of the trial, but the same is a different interest from that of the defendant. You should consider to what extent, if any, such interest has had any influence upon her testimony. It may appear to the jury that other witnesses have an interest in the result of this trial. You should apply the same tests as to credibility and weight to the testimony of every witness sworn on this trial."

It is argued that these instructions must have impressed the jury that much less credit should be given to the defendant than to the complainant, and that the instructions are open to the same objections as those held erroneous in *Schutz v. State,* 125 Wis. 452, 104 N. W. 90, and in *Lee v. State,* 74 Wis. 45, 41 N. W. 960. The instructions given in this trial were quite unlike those in the cases just cited, and in the *Schutz Case* it was said:

"An instruction directing the jury's attention to the peculiar interest of a party in weighing his testimony has generally been held proper, but it should always be qualified by the further instruction that considerations of interest, appearance, manner, etc., apply to him in common with all other witnesses."

The situation here is more analogous to that in *Anderson v. State,* 133 Wis. 601, 114 N. W. 112, where it was argued by counsel for the defendant that the court should not have singled out the testimony of the defendant but should have applied the considerations of interest to all of the witnesses alike. In that case the court gave the following instructions:

"Under the law the defendant is a competent witness in his own behalf. He has given his testimony, and you are the judges of the weight which ought to be attached to it. He is directly interested in the result of the trial. In determining the weight to be given to his testimony it is proper

for you to take such interest into consideration. You are to give his testimony such weight as, under all the circumstances, you think it is entitled to. You have the right to consider his situation, his interest in the result of the trial, the temptation that exists under the circumstances to testify falsely, and everything appearing in the case bearing upon his credibility, and to give to his testimony just such weight as you think it entitled to—no more, no less. His testimony is to be considered with all the other evidence in the case."

In the opinion of the court in this same case it was said:

"The jury were entitled to consider the fact that he had a far greater interest in the result of the trial than any other witness, and this, we think, is the utmost effect which the instruction complained of in the connection it was given could have had upon their minds."

In the case at bar it was clear, as the trial judge said, that the interest of Valda Stocker was different from that of the defendant. In close connection with the instructions objected to the jury were told that as to each witness they should take into consideration his or her appearance and manner of testifying, his or her apparent interest in the result of the trial, if any, the degree of intelligence of the witness, the reasonableness of the testimony given, and every other circumstance bearing upon their credibility and the weight to be given to it. They were also told in substance that it might appear that other witnesses had an interest in the result of the trial and that they should apply the same tests as to credibility and weight to the testimony of every witness. We cannot say that the court improperly singled out the testimony of the defendant and directed the jury to apply to it different tests from those to be applied in weighing the testimony of other witnesses or that giving the instructions excepted to was error.

In another instruction while pointing out the distinction between rape and fornication, the court said: "The offense of rape is a brutal crime, standing next in the category to murder." To which the defendant excepted. This was the

mere statement of a plain truth, and we find no error in the instruction.

The defendant excepts because a new trial was not granted on the ground of newly-discovered evidence. In his opinion the trial judge recited the facts which led him to hold that no diligence was used before the trial to procure evidence of the statements contained in the affidavits. Under the circumstances we consider that the subject rested in the discretion of the court and that the judgment should not be reversed on this ground.

We further agree with the trial court that the affidavit of one of the jurors and the written statements of seven others constituted no ground for a new trial. Verdicts of juries reached after careful deliberation would rest on very weak foundations if they could be set aside on views thus expressed after the trial.

Exception was also taken to the admission of proof of the contents of a letter said to have been written by Miss Stocker to her brother. Without detailing the evidence on that subject, we think the court properly ruled that destruction or loss of the letter was sufficiently explained to admit the evidence which was received.

There was another ruling of the court which we must hold to be erroneous and prejudicial. The State first introduced evidence tending to show that the defendant desired to settle the case and called the brother of the complainant to prove conversations with the defendant on that subject. In one of these conversations, on cross-examination, the witness said that he had told the defendant that the matter ought to be settled out of the courts and that there might be such a thing as that it could be settled for $1,500 if a statement were signed. When the defendant was called as a witness in his own behalf the record is as follows:

"*Q.* Did you converse with her brother Art yesterday? *A.* Yes, sir. *Q.* What did he state to you? Objected to. *Q.* In regard to this case? The Court: That is not com-

petent. Exception. *Q.* Her brother testified a few moments ago to the effect that they were willing to settle for $1,500. The Court: That is a very immaterial matter. We are trying a very grave criminal action here, and if they talked about settling for the support of the child it has little or nothing to do with this matter."

There had been testimony that the defendant desired to settle and was willing to pay $100 rather than have any trouble. Of course there could be no legal settlement of the offense of rape. But when the State introduced evidence on the subject, whatever may have been the purpose, its tendency was to lead the jury to regard it as an admission of guilt. On the other hand, in a case of this character a demand for a considerable sum of money by way of settlement might have an important bearing on the credibility of the complaining witness. Evidently these negotiations were going on in her behalf and with her knowledge.

It is a rule often declared by this court "that, when one party gives in evidence a portion of a conversation material to the controversy, the other party may give the whole thereof, at least so far as it has any relation to the portion already offered." *Earley v. Winn,* 129 Wis. 291, 109 N. W. 633. In another case it was said:

"Error is also assigned because defendant was precluded from proving the balance of a conversation, part of which the State had given. The court apparently applied rather strictly a rule limiting cross-examination to the exact subject of direct examination. The right of a party to call witnesses to testify further as to a conversation of which part has been proved by his adversary is not so limited. In general, such party has a right to give the whole of such conversation, at least so far as it has relation to the subject matter of the action, and is not confined to that particular part thereof given by his adversary." *Paulson v. State,* 118 Wis. 89, 94 N. W. 771; *Emery v. State,* 92 Wis. 146, 65 N. W. 848; *Mack v. State,* 48 Wis. 271, 4 N. W. 449; *Smith v. Milwaukee E. R. & L. Co.* 127 Wis. 253, 106 N. W. 829.

It was at least impliedly assumed by the remark of the court in his ruling that the conversation between Stocker and the defendant related only to settling for the support of the child, and that impression was conveyed to the jury. But in fact it appears from Stocker's testimony that during the conversation there was no mention of the support of the child, which had been adopted some time before. It seems clear to us that the exclusion of this testimony and the assumption by the court that the demand for money was only for the support of the child constituted error and that the error was prejudicial.

The proof was not so convincing but that the jury might well have entertained some doubts as to the guilt of the defendant. One infirmity in the proof was the fact that Miss Stocker made no complaint that the offense had been committed until she was about to give birth to a child. The failure to furnish some evidence of such complaints has been discussed so often in the decisions as an element of weakness in the prosecution that it is unnecessary here to dwell upon the subject. It is probably true that the trial court and the jury concluded that the failure to adduce this very important testimony was supplied by such corroboration as was given in the testimony of Miss Stocker's brother and Mr. Broome. But if the defendant had been allowed to testify fully, the jury might have believed that this testimony was not necessarily inconsistent with the defendant's innocence of the crime of rape. The complainant's testimony that she was unconscious for so long a time and must have been carried to her room by the defendant, who, so far as the testimony shows, had never entered the house, was of such a character that it might well have raised doubts in the minds of the jury as to its credibility. At the age of thirteen or fourteen she had had sexual intercourse with another person. We refer to these subjects as showing that there was no such overwhelming weight of testimony

that the scale might not have been turned the other way if the defendant had been allowed to rebut or explain the testimony which had been introduced and was deemed material by the prosecution.

It is assigned as error that the facts proven were insufficient to sustain the verdict. We have pointed out some of the elements of weakness in the State's case only for the purpose of showing that it would probably have caused no surprise if the verdict of the jury had been entirely different; and that it was therefore of the utmost importance that the defendant should have full opportunity to present any relevant facts which might tend to meet so grave a charge. Nevertheless we cannot say that there was not any credible evidence of the defendant's guilt, nor that it is our duty on this assignment of error to set aside the sentence of the trial court. But for the reasons already stated we consider that prejudicial error was committed and that the defendant is entitled to a new trial.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

OWEN, J. (*concurring*). I not only concur with what is said in the opinion, but I think the case should be remanded with instructions to discharge the defendant. If one may be sentenced to a long term of imprisonment upon evidence disclosed by this record, then the traditional rule that one may be convicted of crime only upon evidence establishing one's guilt beyond a reasonable doubt has become a mere reminiscence in this state.

The story of the defendant is not inherently improbable. It must be admitted, though regretfully, that it is not unbelievable, or that it is contrary to human experience. Should this entirely reasonable story, when weighed in the light of human experience, not only be considered outweighed, when thrown on the judicial scale, by the testi-

mony of the complaining witness, but so shattered as to justify a verdict that his guilt is established beyond a reasonable doubt?

There are many things connected with the testimony of the complaining witness that tax human credulity.  Her statement that she became conscious after she reached her room, but had no recollection of how or when she arrived there, is the first circumstance in the trend of events narrated by her which is somewhat difficult of belief.  Then her entire subsequent conduct is utterly inconsistent with the usual conduct of persons under such circumstances.  She said nothing to any one about the outrage, not only until after the child was born but not until efforts to make the plaintiff contribute to the support of the child had proved unavailing.  Her course of conduct in this respect is so out of harmony with ordinary human instincts and conduct as to be unbelievable—at least so doubtful as to its truth that it should not be permitted to judicially outweigh the testimony of the defendant so as to justify a conclusion that his guilt of a crime which consigns him to a long term of imprisonment has been established beyond a reasonable doubt.  All who are accustomed to weighing evidence know that evidence such as this does not outweigh the testimony of the defendant, and a jury should not be permitted to find that guilt beyond a reasonable doubt is established by such a record.  To permit such a verdict to stand is to abdicate the judicial function and reduce the rule that one can be convicted of crime only upon evidence establishing his guilt beyond a reasonable doubt to a shadow and a myth.

I am authorized to state that Mr. Justice ESCHWEILER and Mr. Justice DOERFLER concur in these views.